Case number 22-5249 et al. Bridgeport Hospital doing business as Yale New Haven Health et al. versus Xavier Becerra, Secretary, United States Department of Health and Human Services, appellant. Mr. Peters for the appellant, Ms. Begonis for the appellate. Good afternoon. Good afternoon. May it please the Court, David Peters on behalf of the Secretary of Health and Human Services. The Secretary promulgated the Low-Wage Index Policy to address growing disparities in high and low-wage hospitals. Two separate provisions of the Medicare statute independently authorize the Secretary to promulgate the policy. The first is 42 U.S.C. Section 1395WWD3E, which gives the Secretary express flexibility in constructing the index. And the second is Section D5I, which gives the Secretary broad authority to issue adjustments and exceptions to factors of the wage index. The Secretary's broad authority under these provisions is evident from statutory texts and confirmed by decisions of this Court. The District Court nonetheless concluded that the Secretary lacked statutory authority to address disparities in high and low-wage hospitals. Mr. Peters, is there any way in which the two actions here, the Low-Wage Index and the Budget Neutrality Policy, can be decoupled? Or does the agency view them as one holistic policy? Your Honor, the Secretary explained that they were adopting the Budget Neutrality Adjustment to offset the effects of the Low-Wage Index Policy. They are two separate adjustments to the wage index, but the Secretary promulgated them together. It's true, Your Honor, that the Secretary – that plaintiffs here are only negatively affected by the Budget Neutrality Adjustment. We haven't argued or appealed that that is a standing issue. But it is true that that's the only policy that they are challenging in terms of the only remedy that they are seeking to make it true. The two were issued together as part of a broader policy to address disparities between high and low-wage hospitals. But if we vacated only the Budget Neutrality Adjustment, what would happen? Your Honor, if only the Budget Neutrality Adjustment was vacated, which we don't think should be the case because we think that both policies – You don't think either one should be vacated? Yes, of course. But taking that for the question, if the Budget Neutrality Adjustment was the only policy that was vacated, the matters would go back to the agency and the Secretary would have to decide what the effect would be on the payments for other hospitals. As we explained in our briefing, the Secretary enacted or promulgated the Budget Neutrality Adjustment to offset the provisions. It would be up to the Secretary to determine whether additional steps may be taken to the payments that had been made now to low-wage hospitals. But again, Your Honor, our position is that neither should be vacated because both Secretaries had statutory authority under two separate provisions to issue it. I'm happy to address that. Again, the D3E authority is a broad grant of authority to the Secretary to make adjustments to the wage index, and one part of that is a determination about how historic data appropriately captures for looking. Do you think it would make sense for us to vacate just the neutrality aspect? Assume we think that that the way you did the adjustment was illegal and that therefore there should have been no adjustment, and because there was no adjustment, it wouldn't have triggered Budget Neutrality Adjustment of the adjustment. It wouldn't make any sense for us to just vacate the Budget Neutrality part of that, right? I mean, that is the remedy that the plaintiff sought, was simply to seek vacature of the Budget Neutrality Adjustment. That would put the Secretary in a bit of a bind or it would create complications for the Secretary on remand, which is what the District Court recognized. What's the practical difference between vacating just the Budget Neutrality part and vacating the allegedly illegal adjustment along with Budget Neutrality? The practical difference between those two? Yeah, sure. The difference would be that in the situation in which both policies are vacated, the Secretary would have to evaluate what the effect would be on the payments to low-wage hospitals whose payments were increased as a result of the policy, whereas that requirement... That's actually a pretty big practical difference. If under Course 1, some low-wage hospitals that have gotten money might have to give some of the money back. Potentially. The Secretary hasn't determined what steps would be taken, but if the policy was vacated, that would call into question payments made to those hospitals. And if the other course were taken, if just the relief that the plaintiffs requested is granted, then you think there's a keep the money? In that situation, Your Honor, the low-wage policy would still be on the books, at least for the time being. It's not clear why the Secretary would then need to go out. The Secretary may have to make a determination to me about whether there would be a requirement to go out because of the offsetting Budget Neutrality being vacated to go out and kind of fall back those payments. That's a determination the Secretary hasn't made yet, and I don't want to hear what the definitive position of the Secretary would be in that situation. Again, Your Honor... I'm happy to turn to the merits. I don't want to step on anyone's toes. So on the merits, do you know of any precedent that interprets the word reflect to to mean what I think you all, what the government needs it to mean, which is, you know, something not very precise? Your Honor, this court's precedent, I would support, I would point to the Antijoc case, both Antijoc cases. You know, the word reflects is expansive enough here to not mandate a specific level of exactitude or precision. If the Congress wanted the Secretary to perform exact calculation and spit out an exact, specifically precise number, they would use the word equals, which they do throughout the statutory provision. The fact that the Congress used the word reflects indicates that there is some play in the joints for the Secretary to make a determination about how data appropriately captures future-looking wage levels. I think we have a precedent that says the government needs to make its, quote, best approximation. Did you do that here? Yes, Your Honor. The Secretary concluded that low-wage hospitals' wage levels were attributable in part to the fact that, to the way in which the wage calculation has operated, and the Secretary reasonably concluded that it would be appropriate to strip out those provisions in the wage index, but it didn't actually reflect regional labor differences. I get that you would argue that your way will accurately predict that low-wage hospitals' wages will be higher in the future, right? Certainly, Your Honor. But it seems like your premise is that they're lower than they should be now. They're lower than you want them to be now, and if that's the case and the formula reflects that, then it seems like that's the best approximation of where they are now. It's supposed to be an approximation of where they are now, right? No, Your Honor. A few things. So, what the Secretary is reasonably approximating is what the regional wage difference will be for the forthcoming fiscal year. So, it is always the case that, because the Secretary has to rely on historic data, that data is always inaccurate in some sense, because it is data from 2016 and the Secretary is relying on it to make a prediction about what regional differences will be like in fiscal year 2020. And so, the best approximation that the Secretary must make is what's the best approximation for what regional wage differences will be like in fiscal year 2020. And inherent in that— And that's what you did here? Yes, Your Honor. And inherent in that is making a determination about how closely data that is four years old captures what the regional differences are going to be. And I would point this Court's attention to the first Anijot case, right? That's the Judge Griffith's opinion, in which the Secretary had data that was accurately reported, and yet the But that's inputs, not outputs. I don't think there's been a case where we've said that government can tinker with the outputs of the wage index, because it basically doesn't like the outputs of the wage index. Well, Your Honor, this wasn't a policy decision about what the Secretary liked or disliked. The Secretary concluded that low-wage hospitals' wage levels—I see I'm running out of time, if I might just— Yeah, please. That low-wage hospitals' wage levels were attributable, in part, to the fact that the calculation itself has this issue of lag and circularity, and decided to strip out those effects from the wage index. Now, in order to make the wage index calculation more accurate, I mean, it's perfectly sensible for the Secretary, who has broad authority to construct the index, to say, if there's something about the way in which I've constructed the index that's levels, we should take that out of the process, which is what the Secretary did here. And that's a perfectly sensible thing for the Secretary to do. I mean, maybe it seems more like you are, as a policy matter, kind of picking some winners and losers, and you're thinking, the low-wage hospitals are not able to attract the talent they need because of the low wages. So we're going to give them some money, but that means taking money away from the high-wage hospitals, because it has to be budget neutral, in which case it's going to be harder for the high-wage hospitals to continue to attract the talent that they've been attracting. So you're sucking talent from the high-wage hospitals and sending it to the low-wage hospitals. Maybe that's a great policy. That seems like almost what I thought the point of it was, as the Secretary explained the point. No, I would direct the Court to 84 FR 42331. The Secretary made it clear that this was not a concern about the accuracy of the wage index. But to take a step back, Your Honor, even if that were the Secretary's conclusion, even if it was a policy-driven, the word reflects it's quite expansive and allows the Secretary to make reasonable determinations about the ways in which historic data captures regional levels. Is your argument that it's not a policy determination? Is that a reason that you haven't asserted Chevron deference in this case on appeal? Your Honor, we haven't invoked the Chevron deference in part because we think the language in the statute itself gives discretion to the Secretary. You concede that Chevron doesn't apply? Your Honor, I wouldn't concede. I would just say that the Court need not reach whether Chevron applies because the language in the statute expressly gives the Secretary discretion, and this Court defers to the Secretary's exercise of that discretion without having to reach the Chevron question. That's, you know, just where you issued a concurring opinion in the Sendium education case that effectively said as much, and I think the same would be true here. So, we're not going to invoke Chevron for that reason. And if I can just go back to remedy, and then I'll be quiet. Can you identify a case like this one where we've held that remand without baffling is appropriate when we say that the agency has exceeded its authority? It's not just the agency has poorly explained, unreasonably explained its decision, but the agency has exceeded its statutory. Yes, Your Honor, we cited a few examples in our brief, but I would give you here as well. The North Carolina VEPA case from 2008, the Center for Biological Diversity, the EPA, that's a team decision. Both of those cases, it was not just a lack of a rational explanation. It was that the Secretary of EPA didn't have authority to promulgate the policy. And especially, I think, Your Honor, in the North Carolina VEPA case, the panel originally held that they couldn't vacate without, they couldn't remand without vacature. And then on reconsideration, it in fact remand without vacature after concluding that it would be appropriate given the kind of disruptive consequences that vacature would entail. I go back and look at the Center for Biological Diversity, and it seems to me it was more of a statutory authority error than... Your Honor, I think with biological diversity, frankly, there's lots and lots of problems with the rule there. It was held invalid on several grounds. I think at least part of it was not just a procedural or something that could be corrected. It was also about the authority to do so. Mr. Peters, HHS says that it maintains its argument that vacator is not an appropriate remedy at all under the APA as a general matter, recognizing, obviously, that our cases say otherwise. But so I'm wondering what the government's position is if we were, say, to issue declaratory relief, say, saying that this regulation exceeds statutory authority, and that's all we did. What would be the difference between that and vacator? Because if we say that this regulation lacks statutory authority, meaning it never had, it was never a lawful regulation, wouldn't that effectively be the same as vacating? Your Honor, it would certainly be the case. I think there are some practical differences on... Tell me what the practical differences would be. In that case, there would be... Secretary would then take steps to remedy the violation. It would do so, though, against the backdrop of the status quo, effectively, where the policies were in place rather than a backdrop of... Why would the policy be in place if a court has said that it never had statutory authority? How could the regulation still be in place? Wouldn't it just be a regulation without lawful authority? Your Honor, I think it would be... I'm not sure there was much of a difference between the two. It would be a regulation that would no longer be... It would be illegal for the secretary to enforce it anymore. Presumably, the secretary would then take steps to be able to give the secretary sufficient room to make a determination of what steps to take there on remand, if the policy was still effectively on the books, even if it wasn't going to be enforced. I think here, Your Honor, the tricky part is payments have now gone out for fiscal year 2020. I'm sorry? Payments have gone out for fiscal year 2020. I think part of the problem would be the secretary having to make a determination about what to do with that. I think in a situation where there's a declaratory brief, the secretary couldn't take any steps to enforce it, but there might not be... There might be a more immediate problem. I wonder if declining to vacate here would set a precedent that, in effect, disruptive consequences alone are enough to remand without vacater. Say in a situation, assuming that we thought the regulation lacked legal authority, and then we were to remand without vacater. In a situation like that, doesn't that give all the weight to the disruptive consequences along with the allied signal factors? Not necessarily, Your Honor. Again, as the district court pointed out with one of the oddities here is that the district court found the principal issue with the wage index policy. The only remedial request was as to the budget neutrality adjustment. And so that was part of the consideration that went into the district court's conclusion. I think it wouldn't be an abusive discretion for the district court to make that determination. It's true that under the allied signal factors, there's always this dynamic where there has been a violation. It does seem to turn a lot on the second factor. But as this court has explained, or as the district court explained, here where there are payments to hospitals nationwide, there might be real reason to be cautious about making the budget neutrality adjustment. I see my time is up. I have one more question. So I have a question. If we were to conclude that there's authority for this lots of letters, statutory provisions. If we were to conclude that, is there any limit on the secretary's ability to make adjustments and exceptions? Because D5I is a pretty broad provision, right? And yet Congress has made all these very specific statutory requirements about how these indexes and payments will be calculated. And then also gives the secretary a broad exceptions and adjustments authority. Is there any limitation on that authority? Certainly, your honor. I mean, this court's decision in Adirondack Medical Center, which on the D5I question is squarely on point. The court there explained that if there are other provisions within the Medicare statute that have sufficiently preclusive language to suggest that that's more specific provision, then that would not be an appropriate use of the D5I authority. But the court there explained that, you know, effectively Congress knows how to use the word only when it wants to be sufficiently preclusive. And then it didn't use the language, excuse me, as the specific provision in the Adirondack Medical Center case. And the same kind of language is missing in D3I. So the secretary could use the D5I authority to enact this policy, even if the D3E authority didn't authorize the secretary to do so. So it's not an unbound amount of authority, but this court has recognized that it is a quite broad spectrum grant of authority. Just one more thing, your honor. I have an observation and then a question. I've been looking at the federal statutes for quite some time, and I have never seen one as detailed as this. There's a constant refrain that we hear that Congress is not doing its job because what it's doing is passing legislation that's very broadly worded and letting the agency fill in the blanks. But this statute is just the opposite. It describes community hospitals as being apart by 30 road miles. It talks about how many beds a particular hospital has to have, how many discharges it has to have. And then some of the mathematical formulas here would challenge, I think, Albert Einstein. We've got, I don't even know what this is, VII, whatever. It's the indirect teaching adjustment. Are you familiar with that? It's C to the X power, parens one plus R to the ninth power minus one, where R is the ratio of the hospital's full-time equivalent interns, and N equals 0.405. Now that's rather detailed legislation. And it seems to me that, and this is not my question, it seems to me that that sort of background in sub four before sub five sort of indicates that the discretion that the secretary has is far from unlimited in the manner that you're talking about, because we're talking about filling in interstices in legislation that is as detailed as any I have ever seen. That's my observation. Here's my question. You agree that, do you not, that the APA applies in this case? I agree. I think the cause of action here is an APA cause of action. Yeah. Right. The 706 is the judicial review provision that governs. Correct, John. That's correct. Okay. Tell me what your interpretation to justify remanding without vacating is in face of, in the face of section 706-2A of the APA, which says when we find otherwise illegal agency action, quote, we shall hold it unlawful and set it aside. What does set it aside mean? I would direct this court, I would direct the question to Justice Gorsuch concurrence in the that it may more naturally be read to be kind of disregard. What's the interpretation you put on that language, hold unlawful and set aside? What's the interpretation you put on it? A few things, Your Honor. For one, I would say that the government's position has been that language in 706- It was what? Among other things, 706 isn't the remedial provision of the APA. It's not mandatory? It's not a mandatory requirement, is the government's position. But this court's- What is it? It's just an optional requirement? No, Your Honor. 706 is the scope of review and it's- It says shall set aside, not may set aside. It says shall. Of course, Your Honor. And the point is only that whether the requirement that there are other provisions that shall be set aside, the government's position is that does not mandate that there be vacature. Our position in this case is that this court has recognized that vacature is the typical remedy under 706 and we are not- This panel can't overturn that, so we're not challenging it. We are just noting that the government's position that that is not- You know, I read your brief and I don't see that you parsing this language at all. And basically, your brief stands for the proposition, well, this court has done that. And look, this case, we just remanded. In that case, we just remanded and we didn't vacate. The problem with that is that it's a troubling proposition because it's basically saying whatever is is right. And the reason it's troubling, it means that nothing that ever was was wrong. Your Honor, we- Our position on appeal is simply that vacature without remedy is an available remedy under this court's precedent, as this court has recognized time and again. And so, we are not asking this court to set new ground in terms of recognizing that vacature without remedy is an appropriate remedy. If I may just address the earlier observation about the detail here. Can I just ask one more question about the remedy? Yes. While you're talking about that, I mean, is it the government's view that whether we remand or vacate and remand is purely a matter of equitable discretion under the APA? It was the district court's remedial discretion as to whether to remand without vacature. And so, the appeal would be whether the district court abused that remedial discretion. If remand without vacature is within equitable discretion, then the position is also that to vacate is also a question of equitable discretion. Like any remedy after finding of unlawfulness is within our equitable discretion. Yes, Your Honor. Vacature would be a- Would be a- Do you think judicial review of agency action in the 20th and 21st centuries are actions in equity? I'm not sure if I've thought through that question sufficiently. I have a very large volume in my chambers, and it's a story on equity. And you can look through it, and you're not going to find an equitable action involving judicial review of agency action. I mean only, Your Honor, that the APA has- that the scope of remedies under the APA is such that the district court can exercise discretion about what remedies to take. And that is, again, I would direct this court's attention to justice courts such as concurrence in the Texas case where it lays out in these arguments. We are not challenging that the availability of vacature without remedy is an inappropriate remedy here. We're just saying that the district court did not abuse its discretion, but it made that determination here. And so, your view is that the APA leaves open this discretion? Yes, Your Honor. These open- Kind of equitable discretion. Because otherwise, where does it come from? Within the APA, then. So, if it's not a law-based remedy, then it must be an equitable remedy? You're right. I would say that, you know, the indication is that when the APA was enacted, courts' general practice was not to- was to treat regulatory action as if it was legislative in nature. And courts' general practice was to, when viewed with an unlawful law, Congress, to treat that law as not binding. But, of course, the court couldn't strike it from the books. And then, when the APA was enacted, courts treated agency action as legislative in nature. So, it would make sense to think that they would do the same type of thing as to a rule, which would say it disregarded, which might be the reason why it set aside languages there, but they wouldn't vacate it in the sense that they would do away with it fully. I was waiting for you to cite John Harrison. Yes, Your Honor. I didn't- I mean, there's some- But if I may, just on the merits, I just wanted to address, Judge Randolph, your point. It is certainly the case that 1395WW and 1395WWD is a particularly detailed provision, but that doesn't foreclose the Secretary's authority, specifically under the D5I provision, to make exceptions and adjustments. You know, the provision that was at issue in the Adirondack Medical Center, which is cited- It says other adjustments. It says- the word other is in- I don't have it in front of me, but in 5, right? Isn't it- By regulation for such other exceptions and adjustments- Other exceptions and adjustments. And so, if you go through sub 4, which precedes sub 5, you'll find all kinds of adjustments and exceptions. And so, why shouldn't we construe that, within 5, as the kinds of minor adjustments that are contained in sub 4, which this is not, by any stretch. Your Honor, this is a temporary policy that affects 0.02 percent of Medicare payments in a given year. It is a very minor policy in terms of its scope. This is the type of adjustment that is very similar to how the Secretary has previously exercised- How much money is at stake here? I think it's $245 million for all hospitals. That's the 0.02 percent. I mean, that's- It's not minor. I mean, maybe that's, in the scheme of things, is a minor number, but- I think the total payments at issue here is $122 billion, and this is affecting 0.02 percent. That's for all payments made under the prospective payment system for 2020. So, the 0.02 percent- Even if you're right, it is minor, doesn't that then suggest that it would not be very disruptive? It might still be disruptive for individual hospitals. The point, Your Honor, was just that this is a temporary policy that was enacted by the Secretary that affects, again, 0.02 percent of payments, that this is the type of adjustment that is contemplated by Section D5I. It's temporary, but hasn't the current administration indicated it plans to use this through 2024? It is continuing for the next fiscal year, 2024, Your Honor. So, it is, as the Secretary explained, it was necessary to maintain this for at least four years because of the way in which the index is calculated, which is the issue that the Secretary was adjusting in the first instance, and they have confirmed it for fiscal year 2024, in part because fiscal year 2020 data is very difficult to parse because it's the year in which COVID-19 affected hospital payment rates. Just to be clear, we see language in your brief, I think, about budget neutrality, right? Yes, Your Honor. I just want to be clear, you're referring to the provision in 3, right? It says, what does it say? I have it here, Your Honor, if you want me to read it. It says, this is provision D3E, several sentences down. It says, any adjustments or updates made under this subparagraph shall be made in a manner that assures the aggregate payments in the fiscal year are not greater or less than those that would have been made without the adjustment. So, that's why you have to rob Peter to pay Paul, right? That is the requirement to be, that is why there needs to be a budget neutrality adjustment, that's what the Secretary concluded, because they're acting under D3E. If you give the bump to the lower quarter, you've got to take away a bump from the upper quarter because of that provision? Yes, Your Honor. Under D3E, the budget neutrality requirement means that because there was a change in the wage index, an adjustment to the wage index, then there must be a budget neutrality requirement. Got it, thank you. Mr. Peters, do you have any cases that have a similar arrangement to the statute, where the statute is very specific in the way Judge Randolph has already described, and then there is also a very open-ended grant of exemption power? Because it's, I mean, those are both in this statute. Both Congress paid extremely detailed attention to how this would be calculated, and then Yeah, I have two, Your Honor. One we discussed at length in our briefs, which is Adirondack Medical Center. The Adirondack Medical Center provision is also in 1395 WWD3. The provision is extremely specific, right? This is providing the authority for the Secretary to make a budget, make an adjustment to one set of hospitals, and then the Secretary relied on D5I to make the same adjustment to another set of hospitals. And this court explained, I mean, the plaintiff's whole theory there was that the use of D5I would render meaningless the more specific provision, and this court expressly rejected that proposition. And that is the exact argument that plaintiffs are making here, and the Adirondack Medical Center reasoning applies with equal force. The second case, Your Honor, just to show that this structure isn't at all novel, is a case that isn't cited in the briefs, but I can give it to you. It's Amgen v. Smith. It is 357 F3rd 103. That's 357 F3rd 103. That's a 2004 case, and it also is a Medicare provision, a Medicare Part B provision. And I have the statutory provision as well, if you'd like, which is 1390, sorry, 1395 L22E, sorry, LT2E. But the provision there was a part of Medicare Part B that said certain adjustments must be made to Medicare Part B reimbursement rates, and then there was a separate provision that required equitable adjustments, and there the Secretary made an equitable adjustment to a Medicare Part B payment rate, even though the more specific provision said that this provision shall be made. And the court there concluded that the broad equitable authority under the exception provision allowed the Secretary to make that. It's the exact same reasoning. It's the exact same structure. It's a very common feature of the Medicare provision. You mentioned Adirondack a lot. I understand why, but it was a Chevron case. You are not asking us to apply Chevron here, so doesn't that matter? I don't think so, Your Honor. I mean, again, the discretion under D5I is expressed, right, as the Secretary deems necessary. That would indicate that the Secretary had— You have to find ambiguity in the formula, right, in order to— So just to start with the D5I provision, then talk to the D3E provision. So the D5I provision gives the Secretary broad authority. This Court generally defers to that exercise of that broad authority. Then there's the D3E provision. Even in this, the Court concludes that D3E didn't authorize the Secretary to promulgate the low-agent policy. All that would mean is that the Secretary lacked authority under that provision. It wouldn't preclude the Secretary from relying on some other provision. And again, that flows naturally from Adirondack Medical Center. The Court was applying Chevron there, but there wasn't any doubt that the provision that was at issue, the more specific provision, didn't authorize the adjustment that was made. And so there wasn't any question about whether there was any— Ambitious on whether it left open this other possibility. I mean, Your Honor, I'm happy to walk through that language, but the provision at issue there was very specific that it allowed an adjustment as to one set of hospitals. Right, and then it was debatable whether or not that same thing could be applied to other non-specified hospitals. No, Your Honor. The Secretary then said the D5I authority could enact another adjustment that that provision would not have provided for. Right. I think we might be saying the same thing, and it might be that I'm misstating it. Since you mentioned Amgen, can I ask you a question about Amgen? Yes, of course, Your Honor. Did we say something along the lines of the word adjustment is similar to the term modify, and that it stands for very limited change, kinds of very limited change that MCI talked about when it defined modify? Your Honor, the court recognized that there was a limit to what adjustment could mean, and if there was a provision like in the MCI case, or let's say the Biden v. Nebraska case, in which there was a wholesale change to the ways in which the statute operated, then that would maybe no longer be an adjustment. In the case, the example in Amgen was, if it had overruled the provision that it was a pass-through adjustment, if it had made pass-through adjustments not available at all, that might not be an adjustment. If the Secretary relied on D5I to say that there was no adjustments at all under the wage index, say the wage index didn't apply, that would be a rewriting of the statute in a way that would be beyond the authority. But to adjust 0.02% on a temporary basis is the precise type of limited modification or adjustment that D5I contemplates, that Amgen contemplates, and that's not the same as the Biden v. Nebraska or the MCI case. So exception and adjustment is a matter of degree? I think that's right, Your Honor. I mean, again, it's an adjustment. How we read these provisions together. Yes, Your Honor, I mean, it's adjustment and exception, right? So the exception contemplates not just an adjustment, but a payment that is required would then be accepted. And so the adjustment, which all it does is shift a percentage of what's being paid, seems to be well within the D5I authority. You know, the adjustment that was issued in Adirondack was also in the hundreds of millions of dollars. There's also the Shands case, Your Honor. There, too, there was a budget neutrality adjustment in the hundreds of millions of dollars. The Secretary has used the D5I authority in the past, very similar to this, to allow certain hospitals to change their wage index provisions when the Secretary concluded that it would be equitable to do so. This is of a piece with what the Secretary has previously done under D5I. I think you have a hard argument, but I think you have made it really well. Thank you, Your Honor. May it please the Court. Katrina Pagonis from Hooper, Lundy, and Bookman on behalf of Apelli Cross-Appellate Hospitals. The Secretary's action here is a poorly researched, expensive, redistributive experiment undertaken without statutory authority, and it has been properly found unlawful by the two district courts to review it to date. Now, this Court has spent some time exploring remedies with my friend on the other side, and so if I can address quickly one issue that has not arisen, which is Apelli Cross-Appellant's interest under 1395-002 of the statute that enables the hospitals to appeal this issue. 1395-002 speaks in terms of a mandate to the Court requiring the award of interest to a prevailing party in a Medicare Act suit such as this. The district court did not address the demand for interest below, and it is the hospital's concern that absent a judicial order requiring a payment of interest, additional steps would be necessary through an uncertain procedural landscape in order to obtain that interest. How do you expect to collect on this judgment? At this moment, CMS could calculate to the penny how much is owed to the hospitals, and for our Apelli Hospitals, it's about $3.6 million. The interest payment, however, the award of interest doesn't need to specify to the penny. It just simply needs to establish the temporal balance. My question is a little bit different than that, because there's an old Supreme Court case, it's Burr, B-U-R-R, but it's not Aaron Burr, in the 50s, I think it is, that says that even though an agency can be sued, and can sue and be sued, and that's a waiver of sovereign immunity, that if there's a question of money damages or monetary recovery, and it has to come out of the Treasury, then that sue and be sued is not a waiver of money coming out of the Treasury. And so the ruling was against the private party in that case, in favor of the United States, which is why I'm asking you, where is this $245 million plus interest going to come from? The Secretary routinely faces adverse judgments and instructs its Medicare administrative contractors to make payment under alternative rules out of the Medicare trust fund. And so it is not a- It's a trust fund? The Part A trust fund for Medicare Part A payments made to hospitals. Oh, okay. It's your honor. So if we vacate remand, do we just say an on-remand to calculate interest, period? Is that how the order looks? The example would be what the district court did in Alleged Health Emanuel, which is granting an award of damages and instructing the Secretary to determine the amount of payment. And the amount of payment would be based on the Secretary's own determination of the hospitals. But the Alleged Health Emanuel provides what I think is a fairly solid model of how these interest awards should be granted in cases that require further action on remand to determine the exact amounts. Why don't you ask for a vacatur of the budget neutrality application, but not vacatur of what you argue is the illegal payment to low-wage hospitals that triggered the budget neutrality adjustment? Absent the budget neutrality adjustment, Appellee Hospitals would not be harmed by the low-wage index policy. It would be a theoretical or academic- You don't have standing to challenge the rule that says pay low-wage hospitals more. If you don't have standing to challenge that part of the rule, then maybe we don't have jurisdiction to vacate that part of the rule. Is that your position? I am not necessarily taking a position about the scope of the court's jurisdiction with respect to the low-wage index hospital policy itself. We don't think that the court needs to go there. And perhaps as a theoretical matter, it is more appropriate for the Secretary on remand to engage stakeholders about what should become of the low-wage- I would have thought you would say we were injured by the adjustment to the wage index to pay low-wage hospitals more because it required the government to pay us less. Therefore, vacate what I just said. Yes, Your Honor. So, Apelli hospitals were undeniably impacted by the pay-for. I had assumed that you were addressing a hypothetical without that kind of impact. But yes, Apelli hospitals were absolutely impacted by the pay-for. Unwinding the pay-for- When you say pay-for, that's the extra payment adjustment for low-wage hospitals, right? The .2016% negative adjustment that applied to the plaintiff hospitals. No, no, no. I'm talking about the adjustment for the low-wage hospitals. The adjustment for low-wage hospitals only impacted other hospitals outside of that quartile to the extent that they had to put the bill for it. Okay. You keep saying that. I'm sorry, Judge Walker. No, I'm not mad at you for being open and honest about what I think your position has been throughout the litigation. I'm not sure I agree, and I'm not sure it's in your interest. I mean, your position is part of why you ended up with remand without vacater. I mean, the district court's view in part was that this strange splitting of this one regulatory policy made it very hard for the district court to figure out what to do. So your litigating position in part has created some of this remedial problem, at least according to the district court. Certainly, the district court said that these two things are inextricably intertwined and our remedies need to address- Aren't they? Why are they not inextricably intertwined? They are intertwined for purposes of evaluating the lawfulness of the payment reduction. One has to look at what the payment reduction- But isn't that your whole position, that it's unlawful? So if they're inextricably connected, I mean, don't they kind of rise and fall together? It would not be unreasonable for a court to take the position that both need to be vacated. Do you just not want to be arguing against giving money to rural hospitals? No. Like, I mean, is there some, you know- The wage index, yes, your honor. I mean, the wage index is an extraordinarily sensitive portion of the inpatient payment statute, and it gives and takes to different hospitals across the country. And we're representing hospitals that were impacted in a very particular way. And so, you know, today I'm only speaking to the impact that they experience. But, you know, the confines of my client's interest don't necessarily mirror what the court's abilities. Some question on the merits. So I think that the government has a very uphill battle to justify its policy under D3E. But what about this exceptions power, right? This, you know, I guess D5I is extremely broad. The secretary shall provide by regulation for such other exceptions and adjustments, right, to payment amounts under this subsection. And if you look at such other, and you look at the types of adjustments that came before, they are arguably of a piece with the type of adjustment that was made here. So why doesn't this provision give them the authority to do what they did? I think, well, a couple things. One is, it's not clear from the final rule that that's what the secretary was doing. When confronted with questions about his D5I authority, he reverted to his argument about D3E and his argument that it was a technical adjustment. Let's assume that they did properly. Yes, Your Honor. So had it been invoked, D5I speaks to other exceptions and adjustments. And Adirondack deals with a particular situation where Congress spoke clearly about standardized amounts, but did not speak about hospitals paid under the hospital-specific rate. And so the secretary made another adjustment for hospitals paid under that hospital-specific rate. Here, we have a situation where Congress mandated the secretary, he shall make adjustments based on the wage index. And so this is not a case like Adirondack, where there was wholesale silence. Congress instructed the secretary of the exact adjustment he had to make with respect to the wage index. And so does this, I mean, what does this, this means that the provision can't, the secretary can't make an exception or adjustment to anything that is specified previously, like, wouldn't that read this provision out of the statute? No, Your Honor, you know, Adirondack provides us with a good example of cases where despite the length of the statute, there might be areas of silence within the statute. It's just my position is that D3E is not one of those areas. Congress mandated to compare the national wage, average wages with the regional wages and do an adjustment to the labor-related faction. Congress went back and created exceptions where it wasn't comfortable with how it was working. It made a lot of it. Congress did make a lot of exceptions. One may ask why after making such specific exceptions, they also gave a broad grant of general exception power, but that is what they did. I mean, you look at the exception just before I is that the secretary can make exceptions and adjustments, I guess, adjustments to take account of the unique circumstances of hospitals located in Alaska and Hawaii. Why isn't an adjustment for rural hospitals, a similar type of adjustment? You know, there's sort of a policy reason for doing it, at least according to the secretary. I mean, you know, there are a whole bunch of these exceptions. And then a provision that suggests that the secretary can make such other adjustments and exceptions, which I read to mean similar to the exceptions that Congress specified. So I guess my question is, why is this adjustment not like those other adjustments and exceptions? I mean, just for the unique circumstances of Alaska and Hawaii. Well, I mean, within the confines of D3E, Congress dealt with frontier states already, dealt with every hospital with a wage index that's less than the national average. And so, you know, the reticulate nature of D3E, you know, and the mandate at the beginning of D3E that makes the wage index adjustment non-optional for the secretary ought not to be read to allow the secretary apply other adjustments to vitiate it. Maybe it would be better policy to not give the secretary such broad exception power in a statute that Congress had made such specific exceptions in. But the statute does give them this exceptions power. So what work does it do? In areas where we don't have a specific versus general problem, it allows the secretary perhaps to do quite a bit. But where Congress has said specifically this must be done, it does not open the door for the secretary to say, you know what, I don't want there to be differences in Medicare payment that are this significant based on differences in wages. And that's what, you know, the secretary did here. D3E mandates differences in payment based on differences in area wages. Mandatory requirements. I want to come back to some of the questions that you or my colleagues were asking you. What occurs to me is that let's suppose you brought this lawsuit and the secretary agreed without responding to the complaint, agreed with your allegation, and therefore removed the decrease, right? That would be illegal, wouldn't it? For the secretary to settle? The secretary, think about judges and orders and everything else. The secretary just caved into your lawsuit and says, OK, I think you've got a point here. I hereby remove the decrease for the top 25%. That would be illegal. The, yeah, the secretary could not make law in a settlement, but with the plaintiff hostiles, he could acquiesce prospectively. And in future rulemaking. They do that because sub three says that the, it's got to cancel out to the same as if no adjustments were made. And in this hypothetical I'm giving you, it's greater than one because the lower 25 would be getting the bump. And that would be illegal under the sub three. All right. So it isn't it? Yeah. So your honors. So, OK, I just want to follow up on that. Yes. If a court orders it, isn't the court ordering the follow up on the questions that my colleagues it is the court ordering the secretary to do something illegal. No, without without touching the lower 25%, a court order to get rid of the the decrease in the top 25% isn't flat out contradiction that provision. So I guess my follow up question is why should whatever ruling comes down be perspective only. Your honor, our view is sorry to clarify. Our view is not that a ruling should be perspective only because we're challenging fiscal year 2020 in this case. And and so it has to apply retrospectively in order to address the payments that were unlawfully withheld from the appellee hospitals. And I believe your question, your honors question is because D3E mandates the aggregate payments under the wage index not exceed what would have not grow because of the wage index, wouldn't paying back hospitals for the point to zero one six percent create a problem within the confines of D3E. Our view is on remand. The secretary would certainly in light of the court's determination that the low wage hospital policy is unlawful. We need to grapple with how to reconcile it. But it but our hospitals shouldn't have to wait for the secretary to figure out what to do with what it's doing with respect to the low wage index hospitals in order to get the full amount of payment that they should. I would also point out that it's very easy to be surgical for the secretary on remand because he applied a wage index adjust budget neutrality adjustment for the natural wage index and then applied for the what for the natural wage index for the wage index. He calculated before this policy and then he did a second budget neutrality adjustment only for this policy. And so it's very clean, very surgical. We know exactly which dollars are paid for for this policy versus the ones that are there to make the normal wage index or natural wage index, so to speak, budget neutral. Imagine the rule has two halves. I'm just going to simplify a little. First half is we're going to pay the low wage hospitals more money. Second half is for budget neutrality reasons. We're going to pay the other hospitals less money. Assume for the sake of this question that I think you have to either vote. You have to either vacate both halves or vacate neither half. Which do you want us to do? I would ask that the court vacate both halves. Okay. You didn't ask for that in terms of the relief below. Can we provide you more relief than you asked? The, you know, the argument in favor of doing so is that the administrative procedure act on section 706 says what the court shall do when it finds something unlawful. And so I, you know, I, you know, although the hospitals haven't sought that here, this court could approach its authority under section 706 and its obligations under section 706 to reach both. And I think you've touched on the answer to this next question some, but I honestly don't understand it. So maybe take another shot or maybe you have a chance to address this specific question. But what is the practical difference for you between vacating neither half and vacating both halves? If the court remands without vacateur on both halves, the concern is the, you know, vacateur can inspire agency indifference, as this court has noted. And the concern is that that will delay our hospital's path to getting made whole. And we know from experience, Medicare litigation and remedies for Medicare litigation can pass on through generations of lawyers. And that should not be the experience of the appellee hospitals here. If I can ask you just one other question about remedy is, is there a difference to your, to the hospitals here, whether we vacated or whether we issued a declaratory judgment saying that this rule was invalid or unlawful? Well, as my friend on the other side acknowledged, Is there, is there a difference? I think that I think that there is a difference in that vacateur makes the rule a nullity. And so on remand, the secretary and his contractors cannot apply it to any hospital when, you know, when settling cost reports, et cetera, and finalizing payments. So it puts us in a circumstance of, of greater player Tory, greater clarity than we would have with just declaratory relief, taking it off the books means that it cannot be applied to our point to 0.16%. Thank you. Thank you. Thank you. May please report. If I may, I'd like to start with the D5I authority. I think as Judge Rau, your question suggested plaintiff's interpretation of that provision would seem to read the broad authority out of the statute plaintiff's position, which seems to echo the district court's position that the secretary can rely on D5I only to the extent that some other provision already authorized the secretary to do that. And that that wouldn't mean that D5I has no independent effect. That can't be right. The exact reasoning that this court rejected in Adirondack Medical Center. It's also true that D5I broadly has any number of exceptions, some of which also apply broadly and some of which authorize additional payments. And so these adjustments here, both the low-wage index policy and the offsetting budget neutrality adjustment are well within of a piece of prior exercises by the secretary of both the D5I and other D5 authority. On the D3E provision, your honor, Judge Rau, you had a few questions about that earlier in the process. I just want to clarify one distinction I think is worth noting. There are two distinct inquiries as to the D3E authority. One is, does the secretary have authority at all to make adjustments when there's a determination that historic data is somehow not appropriately capturing forward-looking regional wage differences? And this court said in the first Hanajat case that the secretary has that authority. It reaffirmed that in the second Hanajat case. Now, there was a separate inquiry as to whether the secretary exercised that authority reasonably and reasonably explained it. And so I just want to clarify that it is clear that this court has said that the statutory authority is, the secretary has a statutory authority to do something like this, even if the court were to conclude that it was somehow unreasonable or unreasonably explained, which we don't agree with. But if the court were to conclude that, that wouldn't be that the secretary lacks statutory authority. It would be that decision was somehow unreasonable and perhaps arbitrary and capricious. I just want to clarify that there is a distinction in there and that this court has consistently recognized the authority of the secretary to make adjustments at this time. My time is up. There are no other questions. Thank you. I'm going to ask for a minute of rebuttal time. Do you have anything further? Yes, Your Honor. I have nothing further to add. Thank you very much. Thank you.
judges: Rao, Walker, Randolph